**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MARK HAYES,

      Plaintiff,

v.

IXP CORPORATION and MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY (MBTA),

      Defendants.

Civil Action No. 19-12042-WGY

**MEMORANDUM IN SUPPORT OF THE MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY'S MOTION FOR SUMMARY JUDGMENT**

Defendant Massachusetts Bay Transportation Authority (the "MBTA") submits this Memorandum in support of its Motion for Summary Judgment. Plaintiff Mark Hayes ("Mr. Hayes") has two surviving claims against the MBTA[1]: Count One of the Amended Complaint for alleged violation of his right to free speech under the First Amendment and Count Thirteen of the Amended Complaint for alleged violation of the Massachusetts Wage Act. Mr. Hayes' First Amendment claim does not survive the so-called "*Pickering* balancing" test because the MBTA's interest in the efficiency of the public services it performs far outweighs Mr. Hayes' interest in the "go back to Africa" statement he made while at work in the MBTA Police Department communications center. Mr. Hayes' Wage Act claim fails because the joint employer doctrine on which he relies has not been and should not in this case be extended to hold liable an entity, such as the MBTA, which had no control over or even knowledge of the payments, which were undeniably the responsibility of Defendant IXP Corporation ("IXP"), his direct employer.

---

[1] This Court allowed the MBTA's Motion to Dismiss the other claims against it. *See* ECF # 25 (Jan. 2. 2020).

## FACTUAL BACKGROUND

The undisputed facts are set forth in the MBTA's Statement of Undisputed Material Facts ("SOF") filed herewith.  What follows is a summary thereof.

Mr. Hayes was an employee of IXP Corporation ("IXP"), a contractor that provides call-taking and dispatch services for the MBTA Police Department.  SOF, ¶¶ 2, 4.  IXP call-takers and dispatchers work in the communications center of the MBTA Police Department headquarters.  *Id.*, ¶ 3.

The IXP call-takers/dispatchers are responsible for all incoming calls by phone and by radio that come into the MBTA communications center.  They come from members of the public, police officers, civilian MBTA employees, other departments within the MBTA, and from State Police and local police in the cities and towns where MBTA services are provided or property located.  All 9-1-1 calls involving incidents on MBTA property anywhere in the state are transferred to the MBTA.  The IXP call-takers and dispatchers are responsible for recording all of these calls and for dispatching appropriate services.  *Id.*, ¶ 11.

The call-taker's function is to receive incoming phone calls and quickly and accurately enter all pertinent information into the computer aided dispatch system (the "CAD system"), which information is then instantly available to the dispatcher on a monitor on his desk.  (If the call is of such an emergency that it requires immediate response, the call-taker may first call out that information to the dispatcher so that he can immediately dispatch police or other emergency response services needed.)  *Id.*, ¶¶ 12-14.

The Dispatchers are expected quickly and efficiently to dispatch the appropriate services in response to all incoming phone and radio calls.  They are directly responsible for all radio calls, which are the principal means of communications from MBTA police officers in need of

2

services.  They must monitor and respond to all calls, which need to be prioritized to address the most urgent first.  Dispatchers must make immediate decisions regarding what services need to be dispatched, whether police units, additional backup, ambulance, fire, or other first responders.  These dispatch obligations include continuing to monitor an event to ensure that additional backup or services are dispatched as needed until the call has been cleared. *Id.*, ¶¶ 17-18.

It is critical to the safety of both of the public and the MBTA police officers that the dispatchers are attentive to their duties at all times.  *Id.*, ¶ 16.  A missed call or a delayed response whether it is a police matter or a medical emergency can have serious, even life threatening consequences.  *Id.*, ¶ 20.  For example, if a police officer is being assaulted, he or she usually has only one chance to get the call for assistance out on the radio.  If the dispatcher misses that call, the police officer would not get the backup he needs and may be seriously injured or killed.  Emergencies arise in the course of police work with some frequency.  *Id.*, ¶¶ 21.

As a result of the critical nature of the services provided by the Dispatchers, no disruptive or distracting communications or behaviors are permitted in the dispatch area.  The MBTA expects the dispatch area to be a quiet area and the dispatchers to act professionally, as they must remain attentive at all times to incoming calls, the CAD system, and ongoing events within the MBTA system. *Id.*, ¶ 22.  To avoid distractions or disruptions, access to the communications center is restricted, and those who work in the center are expected to limit conversation and avoid controversy.  Indeed, there are signs at the entrance to and inside the communications center stating "NOISE SENSITIVE AREA – Please Talk Softly & DO NOT Use Profanity!" *Id.*, ¶ 23.

On the morning of August 4, 2018, Mr. Hayes and Latoya Boman ("Ms. Boman"), another call-taker/dispatcher employed by IXP, were on duty in the MBTA Police Department communications center. *Id., ¶¶* 8, 25. A news segment played on a TV in the communications center[2] about a black woman, Ms. Theresa Okoumou ("Ms. Okoumou"), who Mr. Hayes understood was from the Democratic Republic of Congo and had earlier been arrested for having climbed on the Statute of Liberty. *Id.*, ¶¶ 27-28. According to Mr. Hayes, the broadcast included a video clip of Ms. Okoumou saying: "America, you motherfuckers, you drug addicts, you KKK, you fascist USA." *Id.*, ¶ 28.

Mr. Hayes reacted. He stated: "If she hates America so much, she should go back to Africa." *Id.*, ¶ 29. Ms. Boman, an African American, responded: "That is a racist statement" *Id*., ¶¶ 9, 30. Another IXP employee, Samuel Landais, said that he agreed. Mr. Hayes repeated his statement and Ms. Boman repeated that it was a racist statement and said that she was personally offended. *Id.*, ¶ 30. Mr. Hayes started to further engage Ms. Boman on this topic, but MBTA Lieutenant Albanese, who was in the room, told all parties to stop the conversation. *Id.*, ¶ 36.

Lt. Albanese reported the incident to MBTA Deputy Chief Preston Horton, who in turn reported it up to MBTA Superintendent Sullivan. *Id.*, ¶ 40, 42. Superintendent Sullivan then informed IXP's Project Manager, Harry Marshall, that Mr. Hayes was not to be on the work schedule until he had investigated the incident. *Id.*, ¶ 42. Ms. Boman also reported the incident to IXP. *Id.*, ¶ 43.

---

[2] At the time of the incident, there was a TV in the command area that was to be kept muted. It was there for situational awareness, *i.e.* to be aware of incidents of national or regional news that would not come into the call center but which the officers and dispatchers working in the communications center might need to know. The most dramatic example is the 9/11 attack. SOF, ¶ 26.

IXP informed Deputy Chief Horton by email on Monday afternoon, August 6, 2018, that it had conducted an investigation and, as a result, IXP had concluded that Mr. Hayes' behavior was "inconsistent with IXP's Code of Conduct and established policies and egregious enough to merit dismissal from IXP." *Id.*, ¶ 44.

## ARGUMENT

The moving party is entitled to summary judgment when the record, viewed in the light most favorable to the nonmoving party, "discloses 'no genuine issue of material fact' and [thus] demonstrates that 'the moving party is entitled to a judgment as a matter of law.'" *Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). To defeat a motion for summary judgment, the non-moving party must demonstrate "through submissions of evidentiary quality that a trial worthy issue persists." *Id.* "Withal, a measure of factual specificity is required; a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden." *Id.* (internal quotations and citations omitted).

On the undisputed facts and the law, the MBTA is entitled to summary judgment on the claims against it.

## I. UNDER THE *PICKERING* BALANCING TEST, THE MBTA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FREE SPEECH CLAIM (COUNT ONE).

### A. THE *PICKERING* BALANCING TEST.

A free speech claim brought in the employment context[3] is analyzed in three parts: (1) "As a threshold matter, [the court] must determine whether the employee spoke as a citizen on a

---

[3] Mr. Hayes alleges that he was an employee of the MBTA and has brought his claims as such. The MBTA disputes that Mr. Hayes was an employee of the MBTA; he was an employee of IXP and under contract to IXP. However, for purposes of its Motion for Summary Judgment only, and without admitting or conceding this point, the MBTA has analyzed his claims as if he were an employee of the MBTA.

matter of public concern"; (2) "If so, then [the court] must balance the interests of the employee, as a citizen, in commenting upon matters of concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees"; and (3) "If the balance weighs in favor of the employee, it must then be determined whether the protected speech was a substantial or motivating factor in the adverse action against the plaintiff." *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008) (internal quotations omitted). *Accord, e.g*., *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011). The second part of the analysis (the balancing component) was articulated by the Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563, 568 (1968) and, thus, is often referred to as the *Pickering* balancing test. It is this balancing test on which Mr. Hayes' First Amendment claim fails.

On the plaintiff's side of the *Pickering* scale both the employee's interest in his speech and the public interest in the information he seeks to impart are considered. *Guilloty Perez v. Pierluisi,* 339 F.3d 43, 52 (1st Cir. 2003) ("the value of an employee's speech" in *Pickering* balancing is measured by "both the employee's own interests and the public's interest in the information the employee seeks to impart"); *O'Connor v. Steeves*, 994 F.2d 905, 915 (1st Cir. 1993) (same).

The content of the speech is thus relevant, with whistleblower speech exemplifying the type of content that weighs heavily because of the strong public interest in the information imparted. *Guilloty Perez*, 339 F.3d at 53 (and cases cited). *Accord Jordan v. Carter*, 428 F.3d 67, 73–74 (1st Cir. 2005). The time, manner and place of the speech is also relevant. *Davignon*, 524 at 104. Speech made in a vulgar, insulting, or defiant manner is entitled to less weight, *Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007), while a letter to a newspaper, an online posting, or other forms of speech reflecting "an effort to participate in a public dialogue," is

entitled to more weight. *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 585–86 (4th Cir. 2017).

On the employer's side, "[t]he *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick v. Myers*, 461 U.S. 138, 150 (1983). The Court must consider the employer's "legitimate interests in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." *O'Connor*, 994 F.2d at 915.

The Supreme Court has emphasized that governmental employers must have the ability to control their internal affairs and to remove employees whose conduct impairs efficiency, including by creating disharmony among co-workers:

> "To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency."

*Connick*, 461 U.S. at 150–51 (quoting Justice Powell's separate opinion in *Arnett v. Kennedy*, 416 U.S. 134, 168 (1974)). *See also Hennessy v. City of Melrose*, 194 F.3d 237, 247 (1st Cir. 1999) (school had "considerable interest as an employer in guarding against the impairment of relations among teachers," outweighing the employee's interest).

Further, as the First Circuit has noted, when, as here, the public employer is a law enforcement agency, there is a "heightening [of] the governmental interest on [its] side of the balance under our circuit precedent." *Curran*, 509 F.3d at 50.

### B.     THE INTEREST OF THE MBTA OVERWHELMS MR. HAYES' INTEREST IN MAKING HIS "GO BACK TO AFRICA" STATEMENT.

The decision to terminate Mr. Hayes was made by IXP, independent of the MBTA.  SOF, ¶ 45.  But, even assuming *arguendo* that the MBTA were responsible for the termination of Mr. Hayes' employment,[4] Mr. Hayes' First Amendment claim fails the *Pickering* balancing test.

In the *Pickering* balance, the value of Mr. Hayes' speech, as measured by the public interest "in the information he [sought] to impart" as well as his own interest in making his "go back to Africa" statement is minimal.  One must strain to find any value to the public in Mr. Hayes' statement. His statement does not communicate any information, and thus "the public's interest in the information [he sought] to impart," *Guilloty Perez,* 339 F.3d at 52, can only be described as negligible.

Further, the form of expression used by Mr. Hayes is hardly one reflecting an effort to contribute to public discourse on any of the issues Mr. Hayes claims motivated his comment.  It was an emotional outburst, not a statement intended to communicate anything to anyone.  As Mr. Hayes testified, he was upset because Ms. Okouomou was calling him, and all Americans, a dirty name.  He "wasn't speaking with anyone in ·particular" and "was not having a conversation." SOF, ¶ 32.  By his own admission, his reaction was akin to yelling at the TV during a football game.  *Id*.  He "needed to vent." *Id.*  It was also a crude and offensive form of expression, entitled to less weight than one more thoughtfully made.  *See Curran*, 509 F.3d at 49.

The fact that Mr. Hayes made the statement in the workplace, while he and others, including Ms. Boman, were on duty, further diminishes the weight that should be given to his

---

[4] Even if the MBTA were Mr. Hayes' joint employer, it would not be liable for IXP's actions.  *See Torres-Negron v. Merck & Company, Inc.*, 488 F.3d 34, 41 n. 6 (1st Cir. 2007) ("a finding that two companies are an employee's 'joint employers' only affects each employer's liability to the employee for their *own* actions, not for each other's actions . . . .") (emphasis in original).

side of the *Pickering* balancing.   Mr. Hayes was free to speak out about Ms. Okoumou, immigrants, refugees and to make racially insensitive comments, so long as he did not do so while on duty in dispatch at MBTA Police Headquarters.   He had many other avenues in which to express his views and contribute to public discourse on them, including on social media.   (According to his testimony, he is an active communicator on social media.   SOF, ¶ 34.)   Thus, any burden on Mr. Hayes' speech was minimal.   This is especially true because the speech had nothing to do with his job or the MBTA.   Thus, there was no value to engaging in the speech in the MBTA dispatch area which, as Mr. Hayes acknowledges, is an area that was supposed to be kept quiet and where behavior was to be kept professional.   *Id.*, ¶¶ 22-23.

In contrast, the heavy weight that must be given to the MBTA Police Department's effective and efficient fulfillment of its responsibilities to the public is obvious.   Mr. Hayes and Ms. Boman held positions that were critical to the safe and efficient functioning of the police department.   The call-taker's and dispatcher's function required that they maintain their concentration on their duties—taking all calls immediately when they came in to dispatch, assessing the priority of the calls, accurately inputting vital information into the computer aided dispatch system, dispatching the appropriate emergency, police or other responders necessary to protect the public, the MBTA employees, and the MBTA property.   *Id.*, ¶¶ 11-21.

Mr. Hayes' statement was predictably disruptive.   "Go back to Africa" has a well-known history as a racial trope.

> The phrase "go back to where you came from" has a similar historical context to the term "boy." Even without an explicit racial slur, when told to a black worker, it can easily mean "go back to Africa," a common slur that courts have recognized before. *See, e.g., Hollis v. Austal, U.S.A., L.L.C.,* 2014 WL 4375988, at *3 (S.D. Ala. 2014) (Dubos, J.); *Mandewah v. Wisconsin Dep't of Corr.,* 2009 WL 1702089, at *5 (E.D. Wis. 2009) (Adelman, J.). Indeed, at least one court has recorded "go back to where you came from" in the context of other slurs. *Zeno v. Pine Plains Cent. Sch. Dist.,* 702 F.3d 655, 660 (2d Cir. 2012).

*McCurdy v. Auburn Univ.*, No. 3:14CV226-MHT WO, 2015 WL 2064248, at *5 (M.D. Ala. May 4, 2015).

Indeed, Mr. Hayes admits that he understood that his statement would be understood by others to be racist.  SOF, ¶¶ 31.  Of course, he claims that he did not intend it to be racist,[5] but his subjective intent does not change the predictable consequences of his words—disruption, distraction from his and Ms. Boman's important functions, and disharmony between Mr. Hayes and his fellow dispatcher.

Dispatchers need to work together to efficiently perform their call-taking and dispatch responsibilities, as Mr. Hayes acknowledges.  *Id.*, ¶¶ 12-13, 24.  Any distraction or inattention to those duties creates a risk to the public and to MBTA employees and property.  A missed call or a delayed response can put lives at risk.  *Id.*, ¶ 21.  Mr. Hayes took that risk, distracting both himself and his co-worker.

Lt. Albanese intervened, telling everyone involved to end the conversation.  *Id.*, ¶ 36.  If he had not done so, the disruption would undoubtedly have continued and likely would have escalated.  Mr. Hayes admits that, when stopped by Lt. Albanese, he had just started to try to justify his comment by getting into a long list of issues with Ms. Boman, including his disagreement with Ms. Okoumou's politics, his feelings about her disrespect to the United States and people who have served the United States, and his patriotism.  Amended Complaint, ¶¶ 85-94.

---

[5] Mr. Hayes has contended that he used the phrase "go back to Africa" to express his views that Ms. Okoumou should return to Africa, because she is from the Congo, suggesting that he would not have made the statement had she been born in the United States.  SOF, ¶ 35.  Of course, commentary based on national origin is also offensive and provocative and potentially disruptive to the workplace.

Lt. Albanese acted entirely properly when he terminated the interactions between Mr. Hayes and Ms. Boman.   He was not required to permit the confrontation between them to continue.  As the First Circuit noted in *Curran*, 509 F.3d at 49:

> An employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick,* 461 U.S. at 152, 103 S.Ct. 1684. In *Waters,* the Court stated that it has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large. Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative." 511 U.S. at 673, 114 S.Ct. 1878.

This case does not turn on whether disruption was merely predictable.  Disruption had already occurred.  What was predictable was that it would continue.  Under the circumstances, any continued discussion between Mr. Hayes and Ms. Boman at that time would not have been constructive.  Lt. Albanese exercised the control necessary to protect the interests of the MBTA.  In fact, Mr. Hayes has himself acknowledged that Lt. Albanese acted properly.  SOF, ¶ 37.

Also relevant to the weight to be given to the MBTA's interest in the *Pickering* balancing is the fact that Mr. Hayes' "go back to Africa" comment is of the type that has been identified by the EEOC as potentially unlawful.  *See* EEOC publication on Federal Anti-Discrimination Laws, Ex. D to the Affidavit of Barbara Gruenthal ("Gruenthal Aff.")  ("Examples of potentially unlawful conduct include insults, taunting, or ethnic epithets, such as making fun of a person's foreign accent or comments like, 'Go back to where you came from,' whether made by supervisors or by co-workers").  The MBTA's legitimate interests certainly include avoidance of conduct that may be considered harassing and that may expose the MBTA to liability.  *See Cochran v. City of Atlanta, Georgia*, 289 F. Supp. 3d 1276, 1289 (N.D. Ga. 2017) ("potential

Title VII implications that Plaintiff's speech caused are also strong factors in the [employer's] favor").

In earlier briefing, Mr. Hayes has argued that this case is closely analogous to *Rankin,* 483 U.S. 378 (1987).  It is not.  There, a clerical worker made a comment about the attempted assassination of President Reagan (suggesting she hoped another attempt would be successful). As the majority opinion notes, and the concurring opinion of Justice Powell emphasizes, the statement was made in a private conversation between the plaintiff and her boyfriend, who was a co-worker. *Id.* at 381, 389, 393.  The statement was accidentally overheard by one of the other co-workers in the room.  Not only was there no disruption, but the defendant-employer had no concern about potential disruption of its work operations.  *Id*. at 388-89.

The *Rankin* situation is not comparable to that at issue here situation.  In fact, when one considers the factors that caused the Court in *Rankin* to find that the plaintiff's First Amendment rights had been violated, it makes even more clear why Mr. Hayes rights were *not* violated.  Unlike *Rankin*, Mr. Hayes was involved in important law enforcement functions; he was not a clerical worker.  Unlike *Rankin*, Mr. Hayes made his offensive statement in the communications center of the Police Department while he was on duty, where it would clearly be heard by others present.  Unlike *Rankin*, Mr. Hayes' "go back to Africa" statement was made in the presence of an African American, with whom Mr. Hayes already had a strained relationship, and who predictably was offended.  Unlike *Rankin*, where there was no weight on the employer's side of the *Pickering* scale, there is very considerable weight to the MBTA's side of scale in this case.  Here, unlike *Rankin*, there was an actual and further predictable disruption of a critical law enforcement function.

The *Pickering* scale tips decidedly in favor of the MBTA.  Mr. Hayes had many outlets for communicating his thoughts about Ms. Okoumou.  There was no value to the public in his making his "go back to Africa" statement while at work in the MBTA Police Department communications center.  In contrast, the MBTA Police Department had a very significant interest in avoiding the disruption and distraction from Mr. Hayes' and Ms. Boman's efficient and effective performance of their responsibilities to the MBTA and to the public.  Such disruption literally puts lives at risk.

II.   **HAYES' CLAIM FOR UNTIMELY PAYMENT OF WAGES (COUNT FIFTEEN) FAILS BECAUSE, EVEN UNDER MR. HAYES' "JOINT EMPLOYER" THEORY, IXP WAS ENTIRELY RESPONSIBLE FOR PAYING ITS EMPLOYEES AND THE MBTA HAD NO CONTROL OVER SUCH PAYMENTS.**

Mr. Hayes' claim under Mass. Gen. Laws c. 149, § 148 (the "Wage Act") is based on IXP's failure to give him his last paycheck on the day he was discharged.  When a discharged employee is not given his last paycheck on the date of discharge, but receives the check before filing a complaint, the employee may recover only interest on that paycheck from the date of discharge to the date of payment.  *See Clermont v. Monster Worldwide, Inc.*, 102 F. Supp. 3d 353, 358 (D. Mass. 2015); *McGrath v. City of Somerville*, C.A. No. 17-10979-FDS, 2019 WL 4778337, at *23 (D. Mass. Sept. 30, 2019). Mr. Hayes admits that he is entitled to damages of no more than 24 days of interest on his final paycheck, and that the interest amounts to $3.60.  Plaintiff Initial Disclosures, Ex. C to Gruenthal Aff., p. 7.[6]

It is undisputed that: Mr. Hayes was hired by IXP; the payment terms were agreed upon between IXP and Hayes and without any involvement of the MBTA; IXP agreed to pay and did

---

[6] Mr. Hayes states in his Initial Disclosures that he also seeks $25,000 as a penalty for willful violation of the Wage Act under Mass. Gen. Laws c. 149, § 27C.  Section 27C provides for *criminal* penalties and allows the *attorney general* to issue a civil citation in lieu of bringing criminal charges.  It does not provide for penalties to be awarded to a private party in a civil action.

make all payments to Mr. Hayes; the MBTA has no involvement in any issues as to payment of Mr. Hayes' wages or any benefits; the MBTA had no knowledge of or ability to control the timing of payments made to Mr. Hayes; and Mr. Hayes had no communications with the MBTA regarding payment of his compensation at any time. SOF, ¶¶ 5-7. Thus, IXP was decidedly Mr. Hayes' direct employer (which it does not deny) and Mr. Hayes had no reason to expect payment from the MBTA.

While there are cases suggesting that the concept of "joint employer" may be viable under Massachusetts wage and hour laws, the MBTA is aware of none that have applied that concept to impose liability under facts such as these. In his Opposition to the MBTA's Motion to Dismiss, Mr. Hayes cited *Gallagher v. Cerebral Palsy of Massachusetts*, 92 Mass. App. Ct. 207 (2017), but that case is inapposite. There, the defendant was a "fiscal intermediary" under a MassHealth (*i.e.*, Massachusetts Medicaid) program to provide personal care attendants ("PCAs") to MassHealth members. The plaintiff was a PCA seeking unpaid overtime. Under the MassHealth regulations, the defendant's role was to make payments to the PCAs and the MassHealth members (the consumers) were identified as the employers of the PCAs. The Court concluded that, given the regulatory scheme, the defendant did not fit any concept of "employer." The case suggests that, even though the consumers were the PCA's employers, that did not preclude the possibility that there could be a second employer who might be liable under the Massachusetts wage and hour laws. However, the Court nowhere suggests that under this arrangement—where the consumers received the services but the PCA's were paid by the defendant "fiscal intermediary"—the consumers, who were without knowledge or control over when or how much the PCAs were paid, could be liable for the unpaid overtime.

Two decision of the Massachusetts Superior Court suggesting that there may be liability of "joint employers" under the Massachusetts wage and hour laws are also inapposite because they involve inter-related corporate entities, and are thus really more about disregard of corporate form that the concept of entirely distinct entities as "joint employers."   *See Malebranche v. Colonial Automotive Group, Inc.*, No. SUCV20163479BLS2, 2017 WL 5907557 (Mass. Super. Oct. 20, 2017) (denying motion to dismiss Wage Act claim of car sales employees against parent of multiple subsidiaries that each operated dealerships where plaintiff alleged that parent controlled both the business and employment operations of the dealerships); *Garcia v. Right at Home, Inc.*, 33 Mass. L. Rptr. 346 (Mass. Super. Jan. 19, 2016) (denying motion to dismiss wage claims against franchisor by employees of franchisee where franchisor is alleged to control franchisee's employment practices, including its payment policies at issue; the two entities are "so integrated with one another that [franchisor] is properly considered a joint employer.")

Thus, there is no authority for the proposition that an entity that is neither integrated with the direct employer nor otherwise in control of payment to the employee may be held liable under the Wage Act on a "joint employer" theory.  This is not the case in which the Court should break new legal ground since IXP does not deny that it is the employer responsible for payment, and it is a party to the action and available to satisfy a judgment.

## CONCLUSION

For the above-stated reasons, the Massachusetts Bay Transportation Authority requests that the Court enter judgment in its favor on all claims asserted against it.

Respectfully submitted,

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY,

By their attorneys,

*/s/ Barbara Gruenthal*
Marjorie S. Cooke (BBO # 097800)
mcooke@ccg-law.com
Barbara Gruenthal (BBO # 544209)
bgruenthal@ccg-law.com
COOKE & GRUENTHAL LLP
One International Place, Suite 850
Boston, MA  02110
Telephone:  (617) 428-6800
Facsimile:  (617) 428-6868

Dated:  March 23, 2020

## CERTIFICATE OF SERVICE

I, Barbara Gruenthal, hereby certify that the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on March 23, 2020.

*/s/ Barbara Gruenthal*
Barbara Gruenthal