UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 1:19-cv-12042-WGY

MARK HAYES,                                )
Plaintiff                                  )
v.                                         )
IXP CORPORATION &                          )
MASSACHUSETTS BAY                          )
TRANSPORTATION AUTHORITY,                  )
Defendants                                 )

PLAINTIFF'S CONSOLIDATED MEMORANDUM IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT OF IXP CORPORATION AND MBTA

Plaintiff, Mark Hayes, hereby opposes and submits this memorandum in opposition to the motions for summary judgment of both defendants: IXP Corporation (IXP) and the Massachusetts Bay Transportation Authority (MBTA). "Summary judgment is warranted if the record, construed in the light most flattering to the nonmovant, 'presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.'" *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 20-21 (1st Cir. 2018). "[A]n issue is 'genuine' if the record permits a rational factfinder to resolve that issue in favor of either party" and "a fact is 'material' 'if its existence or nonexistence has the potential to change the outcome of the suit.'" *Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d 1, 7 (1st Cir. 2015).

### COUNT I – FIRST AMENDMENT - FEDERAL FREE SPEECH

#### STATE ACTION OF IXP

"[T]he Free Speech Clause prohibits only *governmental* abridgment of speech. The Free Speech Clause does not prohibit *private* abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). MBTA, naturally, does not dispute that it is a state actor. IXP, naturally, does.

"[A] private entity can qualify as a state actor in a few limited circumstances—including, *for example*,[1] (i) when the private entity performs a traditional, exclusive public function . . . (ii) when the government compels the private entity to take a particular action . . . or (iii) when the government acts jointly with the private entity . . . ." (Citations omitted; emphasis added.) *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1928. "The line of demarcation between public and private action, though easily proclaimed, has proven elusive in application. And the Justices, mindful of the fact-sensitive nature of the inquiry, have staunchly eschewed any attempt to construct a universally applicable litmus test to distinguish state action from private conduct. Instead, they have directed lower courts to take a case-by-case approach, 'sifting facts and weighing circumstances [so that] the nonobvious involvement of the State in private conduct [can] be attributed its true significance.'" *Perkins v. Londonderry Basketball Club*, 196 F. 3d 13, 18 (1st Cir. 1999).

<h2 style="text-align:center">TRADITIONAL, EXCLUSIVE PUBLIC FUNCTION</h2>

Law enforcement is a traditional sovereign function. See *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 173 (1978) (J. Stevens, dissenting). Although the majority in *Flagg Brothers* declined to answer specifically whether law enforcement and fire protection were traditional, exclusive public functions, it acknowledged that they are "administered with a greater degree of exclusivity by States and municipalities than has [that at issue in *Flagg Brothers*,] the function of so-called 'dispute resolution.'" *See id.*, 163-164. Relying on this language in *Flagg* and that of *Evans v. Newton*, 382 U.S. 296, 301-302 (1966) (analogizing a private park to police and fire departments to find state action); the Second Circuit Court of Appeals has since held that fire protection is a traditional, public function. *See Janusaitis v. Middlebury Volunteer Fire Dept.*,

---

[1] Each *example* of state action is not a separate test in and unto itself, but rather a factor to be considered. See *Citizens to End Animal Suffering v. Faneuil Hall*, 745 F. Supp. 65, 69 (D. Mass. 1990).

607 F.2d 17, 22-24 (2d. Cir. 1979) (private fire department was acting as state when it terminated employee).

"[T]he function performed by . . . a policeman . . . is a function that has traditionally been the exclusive domain of the state." (Footnote omitted.) *Citizens to End Animal Suffering v. Faneuil Hall*, 745 F.Supp. 65, 72 (D. Mass. 1990) (likening defendant's prohibition of protestors on its walkways to actions of a policeman to find state action). "A discussion of the police function is essentially a description of one of the basic functions of government . . . . The police function fulfills a most fundamental obligation of government to its constituency." *Foley v. Connelie*, 435 U.S. 291, 297 (1978). "[L]aw-enforcement powers . . . indisputably constitute state action." *Fabrikant v. French*, 691 F.3d 193, 208 (2nd Cir. 2012) (likening animal control to law-enforcement to find actions of private animal control contractor to municipality constitute state action). "[T]he law does not require a badge and gun for someone to function as an agent of law enforcement." *United States v. Higgins-Vogt*, 911 F.3d 814, 821 (7th Cir. 2018) (*Miranda* warning context).[2]

Employment decisions of private entities performing a traditional, exclusive public function are subject to the First Amendment. See *Janusaitis v. Middlebury Volunteer Fire Dept.*, 607 F.2d at 22-24 (finding state action in dismissal of fireman/accountant for speech). "[F]ire protection is a function so traditionally associated with sovereignty that its performance, even by an otherwise 'private' entity, constitutes state action. . . . The nexus test . . . [is] therefore not [a] precondition[] to a finding of state action." (Citations omitted; footnote omitted.) *Janusaitis*, 607 F.2d at 22. Cf. *Grogan v. Blooming Grove Volunteer Ambulance*

---

[2] Some courts have required *private* police officers to have plenary arrest power in order to find state action. See, e.g., *Romanski v. Detroit Entertainment, L.L.C.*, 428 F.3d 629, 638-639 (6th Cir. 2005). Private police force cases are inapposite because IXP participates in the law enforcement efforts of a *public* police department, that of MBTA, which has full police powers. MBTA SOF ¶ 1.

3

*Corps.*, 768 F.3d 259, 267-268 (2nd Cir. 2014) (distinguishing *Janusaitis* from a questionably traditional, exclusive public function: Emergency medical services).[3]

IXP employees dispatch MBTA officers to crime scenes, relaying information about the crime to the officer. Hayes Aff. ¶¶ 8-18. MBTA Police officers make probable cause determinations based on information provided by IXP dispatchers. Hayes Aff. ¶¶ 19-22. MBTA police officers performed the duties of IXP employees before MBTA contracted them out in 2017. Marshall Dep. 15:16 - 15:18. This is sufficient to raise a genuine issue of material fact that IXP participated in the traditional, exclusive public function of law enforcement.

## STATE COMPULSION

The "state compulsion avenue" "demands that an inquiring court ask whether the state has used coercive power or has provided such a substantial degree of encouragement that the private party's decision to engage in the challenged conduct should fairly be attributed to the state." *Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d at 12, citing *Rendell-Baker*, 457 U.S. at 840. In *Rendell-Baker*, "the decisions to discharge the petitioners were not compelled or even influenced

---

[3] Where the public function is questionable, some courts have held that employment decisions made *independent of state influence* are not subject to the U.S. Constitution because they are not related to the public function or the state's influence. See, *e.g.*, *Eastes v. ACS Human Servs., LLC*, 822 F. Supp. 2d 843, 848 (N.D. Ind. 2011) (call center for social services benefits questions; *id.* at 844). The state played no part in the call center operator's termination. See *id.* at 844. In setting forth the rule, the court in *Eastes* seemed to gloss over the exclusivity requirement of the public function. See *id.* at 845-846. Tellingly, the court in *Eastes*; see *id.* at 846; cited *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982) as support, even though the holding in *Rendell-Baker* was that the public function there, the education of maladjusted high school students, was *not* a traditional *exclusive* public function; see *id.* at 842. In *Rendell-Baker* "the various regulators showed very little interest in the school's personnel matters." *Id.* at 841. According to Justice White, "the critical factor [in *Rendell-Baker*] [was] the absence of any allegation that the employment decision was itself based upon some rule of conduct or policy put forth by the State." *Rendell-Baker v. Kohn*, 457 U.S. 830, 844 (1982) (White, J., concurring).

The Fifth Circuit Court of Appeals ruling in *Cornish v. Correctional Services Corp.*, 402 F.3d 545 (5th Cir. 2005), demonstrates why employment decisions of a private employer performing a traditional, exclusive public function for the state *should* be state action. The aggrieved corrections officer at a juvenile detention facility operated by a private corporation in Texas was terminated for having reported to management and state authorities physical assaults of juvenile detainees by corrections officers. See *id.* at 548. His complaint was dismissed for lack of state action because the employment decision was not deemed related to the traditional, exclusive public function of incarceration. See *id.* at 550. The state allegedly played no role in the termination. See *id.* at 550-551. Similarly, in *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227 (9th Cir. 1996), the plaintiff "made no allegations which would involve the government in the decision to terminate him." *Id.* at 1231.

4

by any state regulation" and "the various regulators showed relatively little interest in the school's personnel matters." *Rendell-Baker*, 457 U.S. at 841.[4] In the private contractor to the state context of *Cornish v. Correctional Services Corp.*, there was no state action because there were no factual allegations that the state "exerted coercive power or provided significant encouragement for [the contractor's] decision to terminate [the corrections officer's] employment." *Cornish*, 402 F.3d at 550-51. MBTA emailed IXP instructing them that "action should be taken for this inappropriate conduct[,]" referring to Plaintiff's speech. Marshall Dep. 27:6 - 28:6; Marshall Dep., Ex. 6. IXP understood this to mean that discipline had to be imposed. Marshall Dep. 28:7 - 28:12. MBTA emailed IXP instructing IXP to remove Plaintiff from work at the Transit Police Department (TPD) because of his speech, pending an MBTA investigation. Marshall Dep. 28:14 - 29:16; Marshall Dep., Ex. 7. MBTA contractually retained the ability to request discipline and termination of IXP employees; Marshall Aff., Ex. D, p. 171; and it exercised that right against Plaintiff. Thus, there is a genuine issue of material fact that MBTA encouraged Plaintiff's termination to the extent that it should be deemed an action of the state.

INTERTWINEMENT

"State action may be found . . . if the private party and the state have become so intertwined that they were effectively 'joint participant[s]' in the challenged conduct." *Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d at 8. "To establish state action through [the joint action] route, a plaintiff must show that the state has so far insinuated itself into a position of interdependence

---

[4] Also within the regulatory context, in *Mead v. Independence Ass'n*, 684 F.3d 226 (1st Cir. 2012), a regulator demanded of an assisted living company that the plaintiff employee be replaced as administrator at one of the fifteen assisted living facilities over which the employee was administrator. See *id.* at 230. Our Appeals Court ruled in *Mead* that the demand was not enough compulsion because the regulator did not demand that the employee be terminated; she could have been assigned another position or simply remained on as administrator over the fourteen other nursing homes she oversaw. See *id.* at 232. Such regulatory context is not the one in which defendants' motions lay.

with the [private party] that it was a joint participant in [the challenged activity]. . . . The relevant inquiry demands a deep dive into the totality of the circumstances, with heightened attention to certain specific factors. . . . Those factors include whether the private party is (or is not) independent from the state in conducting its day-to-day affairs . . . ; whether the private party has shared profits generated from its challenged conduct with the state . . . ; and whether the private party has used public facilities . . . ." (Citations omitted; internal quotation marks omitted.) *Id.* at 8-9.[5] The state need not play any role in the challenged action if the state and the private entity are sufficiently intertwined; see *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) (restaurant lessee on government property denied service on basis of race); as is evident from the factors enumerated in *Jarvis*. See *Jarvis*, 805 F.3d at 8-9.[6]

"[IXP] Dispatchers and call takers . . . take directions from [MBTA Transit Police Department] management on a day-to-day basis. . . . If the MBTA has issues with the performance of any of the [IXP's] employees, the MBTA can request, in writing, that the employee be warned for their performance by [IXP] or removed from their job by [IXP]. There [is] no requirement for the MBTA to first warn [IXP] of an employee's performance, and the MBTA can proceed directly to request dismissal of any of the [IXP's] employees." Marshall

---

[5] In *Jarvis*, the private actor was a bonded warehouse for the secure storage of firearms. See *Jarvis*, 805 F.3d at 5. Under Massachusetts law, if a gun owner's firearm license expires and police confiscate the weapon as a result, the police may transfer the weapons to a licensed dealer with a bonded warehouse. See *id.* at 4. If the gun owner does not pay the resulting "reasonable storage fees" to the dealer, the gun may be auctioned off, which is what happened in *Jarvis*. See *id.* at 5-6. "The record reveals no relationship between the activities of the police and those of the Gun Shop" except the Massachusetts law authorizing the police to transfer the weapon to a licensed storage facility. See *id.* at 9. There was no "evidence that the Gun Shop depend[ed] on the state in any respect for the day-to-day operation of its business. . . . Rather, the Gun Shop operate[d] independently in all relevant respects. Once the police transferred possession of the plaintiffs' firearms to the Gun Shop, the police ceased to have any involvement with the storage and eventual auctioning of the confiscated property: all correspondence regarding the storage charges and the sale of the confiscated property went directly between the Gun Shop and the various plaintiffs. By the same token, there is no question but that the Gun Shop wholly own[ed] the facility in which it operate[d] its business." *Id.*

[6] The challenged action also need not be directly related to a public function. See *Jarvis*, 805 F.3d at 8-9 (factors do not include public function); *Burton*, 365 U.S. 715 (denying restaurant service on the basis of race).

Aff., Ex. D, p. 47 (contract between MBTA and IXP). "IXP employees . . . work in the Transit Police Operations Center[,]" which "is the center of the operations of the MBTA Transit Police Department." Newbill Aff., Ex. 10, p. 3. IXP employees work out of the MBTA Police Department station; Marshall Dep. 16:2 - 16:5; dispatching MBTA officers to incidents requiring police response. Hayes Aff. ¶¶ 9-10; Marshall Dep. 14:18 - 15:5. IXP employees answer the emergency and non-emergency lines of MBTA. Marshall Dep. 14:1 - 14:17. MBTA Lieutenants oversee and direct IXP employees in the performance of their job; IXP employees report directly to MBTA Lieutenants. Hayes Aff. ¶¶ 25-29; Marshall Aff., Ex. D, p. 103 (org chart). MBTA Lieutenants are the ultimate decisionmakers as to how to dispatch their officers. Hayes Aff. ¶ 29. IXP employees "operate MBTA equipment and MBTA Software only as directed by the MBTA." Marshall Aff., Ex. D, p. 171. IXP indemnifies MBTA for liability for its dispatchers' actions; Marshall Aff., Ex. D, p. 182; which – although it is not a share in profit – is a significant monetary risk avoidance benefit to MBTA. Thus, there is a genuine issue of material fact that MBTA and IXP are sufficiently intertwined to find state action. Thus, Plaintiff's termination by IXP constitutes state action based on all three tests individually and as a whole under the holistic fact-based nature of examination espoused by the Supreme Court.

## PICKERING BALANCING

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin v. McPherson*, 483 U.S. 378, 383 (1987). "The determination whether a public employer has properly discharged an employee for engaging in speech requires a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through

its employees." (Internal quotation marks omitted.) *Rankin*, 483 U.S. at 384 (citing *Pickering v. Board of Education*, 391 U.S. 563, 568 [1968]; *Connick v. Myers*, 461 U.S. 138, 140 [1983]). Such balancing is commonly referred to as "*Pickering* balancing."

## EMPLOYER-EMPLOYEE STATUS

Plaintiff was an employee of IXP. IXP SOF ¶ 3. MBTA does not challenge that Plaintiff was also an employee of MBTA. MBTA Mem. Supp., p. 5 n.3. MBTA contends, however, that it is not responsible for the actions of IXP even if it were Plaintiff's dual employer. MBTA Mem. Supp., p. 8 n.4. MBTA is partially right in that there is not *vicarious* liability. "To prevail under a theory of joint employer liability, plaintiff must show that defendant knew or should have known of the discriminatory conduct and failed to take prompt corrective measures within its control." *Cagle v. Estes*, No. 3:18-cv-10123-KAR (D. Mass. 2018). See also *EEOC v. Global Horizons, Inc.*, 915 F.3d 631, 641 (9th Cir. 2019). MBTA knew that IXP fired Plaintiff because of his speech and did nothing in response. Newbill Aff., Ex. 10, 13; MBTA SOF. Thus, if IXP is liable, so is MBTA.[7]

## MATTER OF PUBLIC CONCERN

"The threshold question in applying this balancing test is whether [the plaintiff's] speech may be fairly characterized as constituting speech on a matter of public concern. *Connick*, 461 U.S. at 146. Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record. *Id.*, at 147-148." (Footnote omitted; internal quotation marks omitted.) *Rankin*, 483 U.S. at 384-85. "The Supreme Court has defined 'a matter of public concern' as one that 'relat[es] to any matter of political, social, or other concern to the community.'" *Cruz v. Puerto*

---

[7] Even further, as set forth extensively above, MBTA removed Plaintiff from work and encouraged the termination.

8

*Rico Power Auth.*, 878 F. Supp. 2d 316, 327 (D.P.R. 2012) (quoting *Connick*, 461 U.S. at 146). "[P]rivate remarks, such as negative comments about the President of the United States, touch on matters of public concern and should thus be subject to *Pickering* balancing." *San Diego v. Roe*, 543 U.S. 77, 83-84 (2004), citing *Rankin v. McPherson,* 483 U.S. 378 (1987).

In *Rankin*, plaintiff "respondent Ardith McPherson was appointed a deputy in the office of the Constable of Harris County, Texas." *Rankin*, 483 U.S. at 380. "On March 30, 1981, McPherson and some fellow employees heard on an office radio that there had been an attempt to assassinate the President of the United States. Upon hearing that report, McPherson engaged a co-worker, Lawrence Jackson, who was apparently her boyfriend, in a brief conversation, which according to McPherson's uncontroverted testimony went as follows:

> "'Q: What did you say?
>
> "'A: I said I felt that that would happen sooner or later.
>
> "'Q: Okay. And what did Lawrence say?
>
> "'A: Lawrence said, yeah, agreeing with me.
>
> "'Q: Okay. Now, when you — after Lawrence spoke, then what was your next comment?
>
> "'A: Well, we were talking — it's a wonder why they did that. I felt like it would be a black person that did that, because I feel like most of my kind is on welfare and CETA, and they use medicaid, and at the time, I was thinking that's what it was.
>
> "'. . . But then after I said that, and then Lawrence said, yeah, he's cutting back medicaid and food stamps. And I said, yeah, welfare and CETA. I said, shoot, if they go for him again, I hope they get him.'"

*Rankin*, 483 U.S. at 381. "McPherson's last remark was overheard by another Deputy Constable, who, unbeknownst to McPherson, was in the room at the time. The remark was reported to Constable Rankin, who summoned McPherson. McPherson readily admitted that she

had made the statement, but testified that she told Rankin, upon being asked if she made the statement, 'Yes, but I didn't mean anything by it.' . . . After their discussion, Rankin fired McPherson." *Id.* at 381-82 (footnote omitted).

"Considering the statement [in *Rankin*] in context, as *Connick* requires, discloses that it plainly dealt with a matter of public concern. The statement was made in the course of a conversation addressing the policies of the President's administration. It came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President. . . . The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern. [D]ebate on public issues should be uninhibited, robust, and wideopen, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Rankin*, 483 U.S. at 386-87.

In *Connick v. Myers*, an Assistant District Attorney in New Orleans, Sheila Myers, was unhappy with her transfer to a different section of criminal court and – in response – challenged her superiors and distributed "a questionnaire soliciting the views of her fellow staff members concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and *whether employees felt pressured to work in political campaigns*." (Emphasis added.) *Connick v. Myers*, 461 at 140-141. The Supreme Court held that Myers' questionnaire was largely an "extension[] of Myers' dispute over her transfer to another section of the criminal court" and – as such – not of public concern.[8] *Id.* at 148-149. This notwithstanding, the Supreme Court ruled that one question in Myers' questionnaire was a matter of public concern: The one pertaining to *politics*, "whether employees felt pressure to work in

---

[8] The dissent in *Connick* strongly disagreed. *Connick*, *supra*, at 163 (J. Brennan, dissenting.)

10

political campaigns." *Id.* at 149. Even though the court determined that Myers' questionnaire was personally motivated,[9] the part of her speech that pertained to politics merited *Pickering* balancing. *See id.*

In *Jeffries v. Harleston*, 52 F.3d 9, 13 (2nd Cir. 1995), *cert. denied*, 516 U.S. 862 (1995), "Leonard Jeffries was the chairman of the Black Studies department at City College of New York." *Id.* at 11. "In delivering [a] speech, which addressed the bias of New York State's public school curriculum and the history of black oppression, [Jeffries] made several derogatory statements, particularly about Jews." *Id.* at 11. Jeffries' speech[10] "contain[ed] 'clear statements of bigotry and anti-semitism' that "caused an outcry of protest and was condemned both within and without the University." *Jeffries*, 828 F.Supp. 1066, 1073 (S.D.N.Y. 1993). The District Court described the speech as containing "hateful, poisonous and reprehensible statements." *Id.* at 1071. While vulgarity and offense may change the nature of speech, it does not alter its subject matter. Jeffries' speech, thus, was determined to be on a matter of public concern. *See Jeffries*, 52 F.3d at 12.

The statement at issue in the present case is so analogous to the statement at issue in *Rankin* that this case might as well be called *Rankin Part II*. Plaintiff was responding to a news segment discussing the radicalization of the left, utilizing as an example a political protester yelling profane slurs about Americans in opposition to U.S. immigration policies. Hayes Aff., Ex. A; Marshall Dep. 23:3 - 23:9, 24:12 - 26:7; Newbill Aff., ¶ 4. Plaintiff's opinion does not have to be in the form of a doctoral dissertation on the pros and cons of an open immigration

---

[9] The First Circuit Court of Appeals has refused to consider whether the motives of the declarant employee were personal, good, bad, or indifferent in weighing the value of the speech. See *Curran v. Cousins*, 509 F.3d 36, 48 n.9 (1st Cir. 2007).
[10] The text of the speech was not repeated in the opinion of the court. *See Jeffries v. Harleston*, 828 F.Supp. at 1073. Its impact on the community, however, is available in the public domain. *See*, *e.g.*, Alessandra Stanley, *City College Professor Assailed for Remarks on Jews*, N.Y. Times, Aug. 7, 1991, at B1 and B4, https://www.nytimes.com/1991/08/07/nyregion/city-college-professor-assailed-for-remarks-on-jews.html.

11

system to render it of public concern – it can be as crude and offensive as I hope the president gets shot.  *See Rankin*, 483 U.S. at 386-388.  The First Amendment is not reserved for elite college professors.[11]

## EFFICIENCY OF MBTA AND IXP OPERATIONS

Once it is determined that a plaintiff's "statement addressed a matter of public concern, *Pickering* next requires that [the court] balance [the plaintiff's] interest in making [his] statement against the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.  [*Pickering*,] 391 U.S. at 568.  The State bears a burden of justifying the discharge on legitimate grounds.  *Connick*, 461 U.S. at 150."  (Internal quotation marks omitted.)  *Rankin*, 483 U.S. at 388.

Our Supreme Court in *Waters v. Churchill*, 511 U.S. 661, 674 (1994), cited *Rankin*, 483 U.S. at 388, as an example of the kind of speech in which the government would have to make "a *substantial* showing that the speech is, *in fact*, *likely* to be disruptive before it may be punished."  (Emphasis added.)  *Id.*  The speech at issue in *Waters* was not on a matter of public concern and disrupted operations.  See *id.* at 680-681 (plaintiff nurse discouraged another nurse from working in obstetrics, spoke about her superiors in an "unkind and inappropriate" manner, said her superiors could not tolerate her "negativism," and that it "wasn't possible" to "wipe the slate clean" [*id.*]).

---

[11] "[D]eciding whether a particular matter is of public concern is an inquiry that, by its very nature, is a sensitive one for judges charged with interpreting a constitutional provision intended to put the decision as to what views shall be voiced largely into the hands of each of us. . . .  The Court recognized the sensitive nature of this determination in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), which held that the scope of the constitutional privilege in defamation cases turns on whether or not the plaintiff is a public figure, not on whether the statements at issue address a subject of public concern.  In so doing, the Court referred to the difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of general or public interest and which do not, and expressed doubt [about] the wisdom of committing this task to the conscience of judges. . . .  In making such a delicate inquiry, we must bear in mind that the citizenry is the final judge of the proper conduct of public business."  (Citations omitted; footnote omitted; internal quotation marks omitted.)  *Connick, supra*, at 163-164 (J. Brennan, dissenting).

The First Amendment contains a procedural requirement that an employer conduct a reasonable investigation before disciplining an employee for protected speech. See *Waters*, 511 U.S. at 677-678, 686. Interviewing two eyewitnesses and the accused employee was deemed reasonable. *Id.* at 679-680. The speech at issue in *Waters* was oral and was in dispute. *Id.* at 665-666. "The dispute [in *Waters* was] over how the factual basis for applying the [*Connick/Pickering*] test—what the speech was, in what tone it was delivered, what the listener's reactions were . . . is to be determined. Should the court apply the *Connick* test to the speech as the government employer found it to be, or should it ask the jury to determine the facts for itself?" *Id.* at 668. Where the employer conducted a reasonable investigation and the facts found by the employer were in fact reasonable, the court may apply the test based upon such facts. *Id.* at 677-678, 679-681. The corollary to this holding is that where, as here, the government employer conducts a sham investigation, the question must be put to the jury. Where there is a dispute of fact as to whether speech disrupted government operations, resolution of that dispute is for the jury.[12] See *Washington v. Normandy Fire Protection Distr.*, 328 F.3d 400, 404 (8th Cir. 2003); Cf. *Acevedo-Delgado v. River*a, 292 F.3d 37, 45 (1st Cir. 2002).

"Whittled to its core, *Waters* permits a government employer to fire an employee for speaking on a matter of public concern if: (1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." *Jeffries*, 52 F.3d at 13 (2nd Cir. 1995). Cf. *Waters*, 511 U.S. at 674 ("In . . . situations [like *Rankin*] the government may have to make a substantial showing that the speech

---

[12] "[T]he *Pickering* balancing is subtle, yet difficult to apply, and not yet well defined . . . ." (Internal quotation marks omitted.) *Diaz-Bigio v. Santini*, 652 F.3d 45, 53 (1st Cir. 2011) (finding qualified immunity). "*Pickering*'s constitutional rule turns upon a fact-intensive balancing test . . . ." (Internal quotation marks omitted.) *Id.*

is, in fact, likely to be disruptive *before* it may be punished." [Emphasis added.]); *Rankin v. McPherson*, 483 U.S. at 384 ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."). The last prong in *Jeffries* is – if in dispute – one for the jury. *Jeffries*, 52 F.3d at 13-14.

The First Circuit in *Curran v. Cousins*, 509 F.3d 36 (1st Cir. 2007), held that Officer Curran's threats of violence toward Sheriff Cousins and other fellow officers presented an "apparent" "*substantial* risk of disruption to the department." (Emphasis added.) *Id.* at 49.[13] Speculation without facts in the record to support an actual disruption – even in the law enforcement context – are insufficient. See *Fuentes v. Hampden County Sheriff's Dept.*, 429 F. Supp. 2d 253, 260 (D. Mass. 2006) (denying summary judgment as to First Amendment claim).

In *Connick v. Myers*, *supra*, the Supreme Court agreed with the District Court that "there [was] no demonstration . . . that the questionnaire impeded Myers' ability to perform her responsibilities[,]" but because A.D.A. "Myers' actions . . . cause[d] a 'mini-insurrection[,]'" and "was an act of insubordination which interfered with working relationships[,]" the Supreme Court determined that *Pickering* balancing weighed in favor of the employer.[14] See *Connick*, 461 U.S. at 149.

---

[13] Officer Curran "confront[ed] senior officers in a threatening and/or insubordinate manner while on duty" and created online posts to the officers' union website wherein Officer Curran identified Sheriff Cousins as Hitler and the Sheriff's Department's deputies and captains as Nazi general. *See id.* at 42-43. Officer Curran, by analogy to an assassination attempt on Hitler wherein a bomb went off that killed three people, "urged a similar secret plot against the Sheriff." *See id.* at 48. "There [was] little question in [*Curran*] that the Department's concerns about disruption were reasonable. The statements [in *Curran*] directly went to impairing discipline by superiors, disrupting harmony and creating friction in working relationships, undermining confidence in the administration, invoking oppositional personal loyalties, and interfering with the regular operation of the enterprise." *Id.* at 50, citing *Rankin*, 483 U.S. at 388.

[14] Also relevant to the balancing in *Connick* was that "the questionnaire was prepared, and distributed at the office; the manner of distribution required not only Myers to leave her work but for others to do the same in order that the questionnaire be completed." *Id.*, at 153.

IXP, when given the opportunity to justify Plaintiff's termination before the Massachusetts Commission Against Discrimination, made no mention of how his speech was likely to effect operations. Newbill Aff., Ex. 11, p. 4 ("[Plaintiff's] statement is objectively[15] understood as racist, harassing, intimidating, hostile and offensive. This statement was heard by other IXP and MBTA employees in the vicinity of [Plaintiff]. IXP reviewed the incident and determined that [Plaintiff] violated the IXP Code of Conduct[16] and established policies and therefore his conduct warranted termination of his employment.") This alone is sufficient to create a genuine issue of material fact that IXP did not consider the efficiency of their operations when terminating Plaintiff, which is a question for the jury. See *Jeffries*, 52 F.3d at 13-14; *Washington v. Normandy Fire Protection Distr.*, 328 F.3d at 404; cf. *Acevedo-Delgado v. River*a, 292 F.3d at 45. If IXP fired Plaintiff because of the content of his speech rather than its impact on their operations, IXP violated the First Amendment. See *Jeffries*, 52 F.3d at 13-14. Plaintiff and Latoya Boman had an absolutely toxic relationship well before Plaintiff's statement. Hayes Dep. 89:15 - 90:18, 160:14 – 162:3, 179:12 – 180:23. IXP testified that their relationship had at one point reached "a boiling point"; Marshall Dep. 45:17-22; and that when supervisor Harry Marshall tried to resolve Boman's sensitivity to Plaintiff, Boman walked out of the meeting without any resolution. Marshall Dep. 45:17-46:10. Boman stormed out of two meetings between Plaintiff, herself, and Marshall. Hayes Dep. 179:21-23. The foregoing creates a genuine issue of material fact that the IXP did not terminate Plaintiff because of his speech's potential impact on operations, but just because it disagreed with the speech itself.

---

[15] IXP acknowledged at the deposition that similar statements made by President Trump that were actually directed towards African American senators are considered by some not to be racist, that the determination is "subjective." Marshall Dep., 26:13 - 27:5. IXP's characterization of Plaintiff's statement as "objectively" racist is further evidence that IXP did not investigate, but simply concluded the statement was racist and fired Plaintiff.

[16] "Never: . . . [m]ake insults or tell jokes of a racial . . . nature. Violations of this policy may result in disciplinary action, up to and including termination." Newbill Aff., Ex. 11, p. 12. Such policy is unconstitutionally vague.

Defendants argue that Boman's response to Plaintiff's statement was enough of a disturbance to merit Plaintiff's termination. First, unlike *Connick*, Plaintiff and Boman were off duty at the time Plaintiff's statement was made.[17] Furthermore, according to Defendants' logic, if an IXP employee remarked in the precinct that "we don't need another privileged white man for president" and a white male officer were to take offense and say, "that's racist and sexist comment," that would be a sufficient disturbance to merit termination. No, the disturbance must be "in fact." See *Waters*, 511 U.S. at 674. IXP must have conducted a reasonable investigation and made a correspondingly reasonable determination that Plaintiff's continued employment would have imperiled their operations. See *Waters*, 511 U.S. at 677-678. Marshall, the person who investigated and made the decision to terminate Plaintiff; Marshall Dep. 9:16 - 9:17; Marshall Aff., ¶¶ 10-21; did not speak to a single person other than Plaintiff[18] that was present for Plaintiff's speech. Marshall Dep. 38:3 - 38:5. That is not a reasonable investigation.

Boman did not request Plaintiff's termination. Newbill Aff., Ex. 12, ¶ 15. In fact, *Boman never even submitted a complaint*; she was asked to submit a written statement by IXP and that is the only statement IXP received from her concerning the incident. Marshall Dep. 33:3 - 35:15, Ex. 8; Newbill Aff., Ex. 12, ¶ 13. Moreover, in her report, Boman wrote that "she was bothered at the moment the comment was made, but [she is] okay now." Marshall never

---

[17] MBTA Lt. Albanese said that he heard Plaintiff's comment on August 4, 2018, at "approximately 0725," and that Plaintiff "had ended his shift." Horton Aff., Ex. C. IXP testified that Plaintiff clocked out at 7:00 a.m. that day; Chertoff Dep. 20:8 - 20:11; and Plaintiff and Boman worked the same shift. Marshall Dep. 44:5 - 44:10; MBTA SOF ¶ 25.

[18] On August 5, 2018, Marshall called Plaintiff and told him that he was being suspended with pay pending an investigation, Plaintiff tried to explain himself, but Marshall did not want to hear Plaintiff's version of events. Hayes Dep., 167:1-24; Newbill Aff., Ex. 14. On August 6, 2018, Marshall called Plaintiff and told Plaintiff that he was being terminated, Marshall did not ask Plaintiff his version of events. Newbill Aff., Ex. 14. IXP tries to characterize Plaintiff's efforts to introduce his version of events as "arguing" and evidence of disruption. SOF ¶¶ 36, 46. This mischaracterization highlights the lack of investigation on the part of IXP.

16

followed up with Boman.  Marshall Dep. 38:3 - 38:5.  Defendants failed to submit an affidavit of Boman and the affidavit of Landais merely recounts what was said – which is in dispute.[19]

Defendants' argument that Plaintiff's statement should be accorded less weight because he was personally offended by the political protester on the T.V. and he did not direct his statement at anyone in particular is not supported by logic[20] or case law.  See *Rankin*, 483 U.S. at 386-87; *Connick v. Myers*, 461 U.S. at 149.  On the contrary, that Plaintiff did not direct his statement toward Boman, who was – unbeknownst to him – within ear shot; Hayes Dep., 88:3-15; should weigh in his favor because it distinguishes his statement from the cases and empirical evidence Defendants cite to show that his comment was racist.  Even if the balance weighs in favor of IXP, Defendants' motions should be denied because there is a genuine issue of material fact that IXP terminated Plaintiff because of the content of his speech rather than any perceived disturbance to their operations, which is a question for the jury.  See *Jeffries*, 52 F.3d at 13-14; *Washington v. Normandy Fire Protection Distr.*, 328 F.3d at 404; cf. *Acevedo-Delgado v. River*a, 292 F.3d at 45.

## COUNT II – MCRA – STATE FREE SPEECH

"The Legislature enacted G.L. c. 12, §§ 11H and 11I, [Massachusetts Civil Rights Act (MCRA),] to provide a State remedy for deprivations of civil rights.  The statute extended beyond the limits of its Federal counterpart by incorporating private action within its bounds. We conclude that the Legislature intended to provide a remedy under G.L. c. 12, § 11I, coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not.   The language requiring interference 'by threats, intimidation or

---

[19] The conversation was shut down by Lt. Albanese before anything else was said after Boman said Plaintiff's statement was racist.  Hayes Dep., 163:4-10.
[20] Personal offense is inherent to political discussion.  Plaintiff commented on a news segment that was being discussed by his colleagues around him; Marshall Dep., Ex. 8; in a manner loud enough to be heard.

17

coercion, or attempt to interfere by threats, intimidation or coercion . . .' is addressed to this private action." *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822-23 (1985). In *Batchelder*, "[a] uniformed security officer [at a shopping center mall] ordered Batchelder to stop soliciting and distributing his political handbills. Though Batchelder objected, he complied. This was sufficient intimidation or coercion to satisfy the statute. This interpretation is consistent with the liberal construction which should be afforded civil rights statutes and provides the State remedy for civil right violations that the Legislature sought." *Id.* at 823. Lt. Albanese, a policeman, ordered Plaintiff, a civilian, to "quiet down" and "shut up." Hayes Dep., 162:20 - 163:7. This is enough under *Batchelder*. The plain language of the MCRA does not require the victim to *feel* intimidated or threatened. Further, Plaintiff felt intimidated by the hostility of Boman that IXP allowed to continue unabated; Hayes Dep. 179:12 - 180:23; and Plaintiff's termination was the final extension of that hostility.

## COUNT XIII - WAGE ACT

Any employee who is not paid in full on the date of discharge suffers a cognizable injury under M.G.L. c. 149, § 148 (Wage Act). See *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 22 (1st Cir. 2018). IXP did not pay Plaintiff in full on his date of discharge, admits liability therefor, and asks for judgment for Plaintiff limited to interest. IXP Mem. Supp., pp. 11-12. Plaintiff agrees with IXP that he is not entitled to triple the amount of the late payments. See *Dobin vs. CIOview Corp.*, Middlesex Superior Court, No. MICV2001-00108, 2003 WL 22454602 (Oct. 29, 2003).[21] Plaintiff, however, is entitled to trebled interest[22] plus attorneys' fees and costs.[23] See *id.* (where payment is made before the bringing of a complaint, "the only

---

[21] Massachusetts "state law supplies the substantive rules of decision [as to the Wage Act]." *Lawless*, 894 F.3d at 21.
[22] Plaintiff agrees with the interest calculation of IXP of $7.07. See IXP Mem. Supp., p. 12 n.9.
[23] Plaintiff included attorneys' fees in his initial disclosures. See IXP SOF, Ex. 7.

damages that [a plaintiff] may be awarded under the Wage Act, apart from attorney's fees and the costs of litigation, are the foregone interest she suffered from the delay in paying her monthly wages, trebled"). As for MBTA, there is a genuine issue of material fact that MBTA is liable under M.G.L. c. 149, § 148B, because Plaintiff performed services for MBTA under MBTA control; Hayes Aff., ¶¶ 8, 25-29; Marshall Aff., Ex. D, pp. 47, 103; § 148B supplants the common law;[24] and § 148B is a strict liability statute; see *Lighthouse Masonry, Inc. v. Div. of Admin. Law Appeals*, 466 Mass. 692, 698-699 (Mass. 2013) ("§ 148B . . . is a strict liability statute" [citation omitted]).

## COUNT XIV – ERISA (COBRA)

"COBRA requires employers to give employees the opportunity to continue health care coverage for a specified period of time after a 'qualifying event,' at the employee's expense. . . . Termination of employment is considered a qualifying event. . . . COBRA also requires employers to notify health care plan administrators of the termination within 30 days of the qualifying event. . . . Thereafter, plan administrators have fourteen days to notify the qualified beneficiary of her right to continued coverage." (Citations omitted.) *Torres-Negrón v. Merck & Company, Inc.*, 488 F.3d 34, 45 (1st Cir. 2007), citing 42 U.S.C. §§ 1161(a), 1163(2), 1166(a)(2), 1166(c).

"COBRA does not state how notice should be given. But courts that have addressed the issue have held that a good faith attempt to comply with a reasonable interpretation of the statute is sufficient." *Torres-Negrón*, 488 F.3d at 45. Where an employer has information that an

---

[24] Section 148B supplants common law with respect to finding an employer-employee relationship; see *Gallagher v. Cerebral Palsy of Mass., Inc.*, 92 Mass. App. Ct. 207, 210 (Mass. App. 2017); and, although the question has been left open as to whether § 148B supplants the common-law joint employer test; see *id*., 214; it only follows that if the legislature intended § 148B to supplant the common law, it intended to do so in its entirety. The plain language of § 148B indicates that the legislature sought to avoid contractual schemes meant to evade wage laws, which is of the like between IXP and MBTA. Marshall Aff., Ex. D, pp. 166-167 (independent contractor status language).

19

employee's address has changed, and the employer, notwithstanding this information, causes the COBRA notice to be sent – *through the administrator* – to an incorrect address, summary judgment for the employer should be denied. See *Torres-Negrón*, 488 F.3d at 45-46 (reversing summary judgment as to COBRA claim).

Plaintiff never received COBRA notice. Hayes Aff., ¶¶ 1-4. IXP provided Plaintiff's address when it notified its administrator of Plaintiff's termination. Chertoff Dep., 16:15-18. The termination letter IXP sent to Plaintiff on August 7, 2018, was returned as undeliverable. Chertoff Dep. 18:10-18, Ex. 4. Thus, when IXP provided its administrator with Plaintiff's address on August 27, 2018; Chertoff Aff., p. 8 (Ex. B); it knew that Plaintiff was unable to receive mail at the address it provided. Chertoff Dep. 18:10 - 19:3. Thus, there is a genuine issue of material fact that IXP did not make the required good-faith effort to provide Plaintiff with COBRA and notice thereof. See *Torres-Negrón*, 488 F.3d at 45-46.

Respectfully submitted,
Plaintiff, through his attorney:
/s/ Lucas Newbill                                                                     Dated: April 13, 2020
Lucas Newbill, BBO No. 697176
Law Offices of Lucas Newbill, P.O. Box 174, Brookline, Massachusetts 02446
Tel. 617-918-7567; Fax. 617-910-2514; lucas@lucasnewbill.com

CERTIFICATE OF SERVICE

I hereby certify that this document was filed on this date through the court's electronic-filing system (ECF) and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent on this date to those participants indicated as non-registered participants.

Dated: April 13, 2020          /s/ Lucas Newbill
                                                Lucas Newbill, BBO No. 697176