UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
MARK HAYES,                   )
                              )
              Plaintiff,      )
                              )         CIVIL ACTION
          v.                  )         NO. 19-12042-WGY
                              )
MASSACHUSETTS BAY TRANSPORTATION )
AUTHORITY and IXP CORPORATION, )
                              )
              Defendants.     )
                              )
_____
```

YOUNG, D.J.                              October 27, 2020

**MEMORANDUM AND ORDER**

I.   **INTRODUCTION**

This case revolves around an inflammatory comment uttered in a public work setting: "She should go back to Africa."  The speaker and plaintiff, Mark Hayes ("Hayes"), was referring to a protester appearing on the television at his office.  A minor ruckus ensued in his office, which was the 911 call center of the Massachusetts Bay Transportation Authority ("MBTA") police department.  Shortly afterward Hayes was fired, and he now sues the MBTA and his direct employer, the contractor IXP Corporation ("IXP"), for violation of his free speech rights.

Hayes himself acknowledges that his remark, heard out of context, would reasonably be taken as racist.  Indeed, the "go

1

back to Africa" epithet has a long and ugly history in this country and in Massachusetts.[1]  Yet Hayes maintains that his subjective intent was not racist.  The protester on TV was a refugee from the Democratic Republic of Congo and naturalized United States citizen, and she had voiced a harsh and vulgar criticism of U.S. immigration policies.  His comment "had nothing to do with the color of her skin," he avers, and he "would have felt the same thing" if the protester had been "from France or Sweden or Canada."[2]

From a legal standpoint, nothing turns on whether Hayes harbored subjective racist intent.  The Court need not determine whether the comment was racist, since even offensive and bigoted statements may enjoy First Amendment protection.  Nor is it the role of this Court to decide whether Hayes should have been fired for this incident.  Rather, the sole question before this Court is whether Hayes' termination violated his right of free speech.  To decide this matter, Supreme Court precedent requires

---

[1] See, e.g., Katie Rogers, The Painful Roots of Trump's 'Go Back' Comment, N.Y. Times (July 16, 2019), https://www.nytimes.com/2019/07/16/us/politics/aoc-trump-tlaib-omar-pressley.html; John R. Ellement, Two Brothers Face Civil Rights Charges After Attack on Black Man Outside Dracut Store, Boston Globe (Dec. 4, 2019), https://www.bostonglobe.com/metro/2019/12/04/two-brothers-face-civil-rights-charges-after-alleged-attack-black-man-outside-dracut-store/ni3Tfjsr7fUNjpKdvBUNTI/story.html; United States v. Three Juveniles, 886 F. Supp. 934, 939 (D. Mass. 1995) (Saris, J.).

[2] Aff. Lucas Newbill, Ex. 9, Dep. Mark P. Hayes 168:18-22, ECF No. 55-9.

weighing the public employee's interest in making the comment against the employer's interest in an efficient and harmonious workplace environment.  This balancing is intensely fact-bound, since it involves determining the precise nature of the conversation at issue and the true motivations of the employer who fired him.

On this record, there are triable questions of fact that preclude summary judgment on the free speech issue.  First, the parties dispute whether Hayes was venting to himself (or perhaps at the TV, as statedin his deposition) or, rather, having a conversation with his colleagues in the office.  His First Amendment interest in venting is negligible, but much less so if he was genuinely conversing with others.  More important, First Circuit precedent suggests that it is the employer's "true motivation for firing" Hayes that matters.  Mihos v. Swift, 358 F.3d 91, 103 (1st Cir. 2004).  The parties dispute whether (as the MBTA and IXP assert) Hayes was fired to protect the workplace from disruption and to enforce its own policies or (as Hayes argues) in retaliation against his unpopular political speech.  If in fact the motivation was the former, Hayes would likely lose; where it the latter, he would likely win.  Such factfinding cannot be done at the summary judgment stage.

### A.    Procedural History

On September 6, 2019, Hayes filed a complaint against IXP and the MBTA in Massachusetts Superior Court.  Notice Removal, Ex. C, Compl., ECF No. 1-3.  The case was removed by the MBTA to this Court on October 1, 2019.  ECF No. 1.  Hayes filed an amended complaint on December 13, 2019.  Am. Compl., ECF No. 22. On January 2, 2020, after briefing and oral argument, the Court granted in part and denied in part the defendants' motions to dismiss.  Order, ECF No. 25.

On March 23, 2020, both defendants moved for summary judgment.  MBTA's Mot. Summ. J., ECF No. 38; Mem. Supp. MBTA's Mot. Summ. J. ("MBTA's Mem."), ECF No. 39; IXP's Mot. Summ. J., ECF No. 43; Mem. Supp. IXP's Mot. Summ. J. ("IXP's Mem."), ECF No. 44.  Hayes opposed the motions.  Pl.'s Consolidated Mem. Opp'n Mots. Summ. J. IXP & MBTA ("Opp'n"), ECF No. 53.  After hearing oral argument on May 14, 2020, the Court disposed of some ancillary claims and took the free speech claims under advisement.  Electronic Clerk's Notes, ECF No. 61.  These claims -- counts I (federal free speech), II (state free speech), and XII (wrongful termination because of protected speech) of the amended complaint -- are now the only claims pending before the Court.  See Am. Compl. ¶¶ 245, 247, 272.

**B.    Undisputed Facts**

The MBTA contracted with IXP in 2017 to provide call-taking and dispatch services for the MBTA Police Department.  Def. MBTA's Statement Undisputed Material Facts Supp. Mot. Summ. J. ("MBTA's Facts") ¶ 2, ECF No. 40.  Hayes was an at-will employee hired by IXP as a dispatcher on November 6, 2017, working in the MBTA Police Department's headquarters located at 240 Southampton Street in Boston.  Id. ¶¶ 3-4; Statement Facts IXP's Mot. Summ. J. ("IXP's Facts") ¶ 3, ECF No. 45.

All 911 calls that involve incidents on MBTA property anywhere in the state, along with other routine or emergency calls, are transferred to the MBTA Police Department communications center where Hayes worked.  MBTA's Facts ¶ 11. The call taker processes incoming calls and relays the information via a computer aided dispatch (CAD) system to the dispatcher, who then communicates with the relevant police officers or emergency responders.  Id. ¶¶ 11-13.  "If the call is such an emergency that it requires an immediate response before it can be entered into the CAD system, the information is communicated verbally by the call-taker calling out to the dispatcher."  Id. ¶ 13.  Latoya Boman ("Boman") was another IXP employee in the same office performing dispatch functions.  Id. ¶ 8.  Hayes was the "main" or "No. 1" dispatcher and Boman was a

call taker.  Id. ¶ 10.  Hayes is white and Boman is African-
American.  Id. ¶ 9.

Both Hayes and Boman worked the overnight shift on August
3-4, 2018.  Id. ¶ 25.  While at work on the morning of August 4,
2018, Hayes watched a news segment on the television in the
office.  Id. ¶ 27.[3]  Though the television was supposed to be on
mute so as not to distract the employees performing emergency
services, Hayes "heard every word" of the news segment.  Id. ¶¶
26-27.  The segment featured Therese Patricia Okoumou, a
naturalized U.S. citizen originally from the Democratic Republic
of Congo, who had climbed the Statue of Liberty on July 4th to
protest U.S. immigration policies.  Id. ¶¶ 28, Pl.'s Resp.
MBTA's Facts ¶ 32, ECF No. 56.  "The broadcast showed Ms.
Okoumou chanting: 'America, you [beep], you drug addicts, you
KKK, you fascist USA;'" Hayes believed the beeped out word to be
'motherfuckers.'"  MBTA's Facts ¶ 28 ; see also Aff. Lucas
Newbill, Ex. 9, Dep. Mark P. Hayes ("Hayes Dep.") 54:4-19, ECF
No. 55-9.

Watching this news segment, Hayes commented: "If she hates
America so much, she should go back to Africa."  MBTA's Facts ¶
29.  That statement (the "Statement") set in motion the ensuing

---

[3] The parties dispute whether Hayes was on duty at the time
of the incident.  See ECF Nos. 64, 65.  That dispute is
immaterial to the resolution of this case.

events that led to this litigation.  Boman remarked that Hayes'

comment was "racist," leading David Albanese ("Albanese"), an

MBTA lieutenant, quickly to shut down the conversation.  Id. ¶¶

30, 36.  Hayes later explained that he was "upset" by the news

report and, in making the Statement, "wasn't speaking with

anyone in particular" and "was not having a conversation" but

rather he "needed to vent."  Id. ¶ 32.  By way of analogy, he

compared his verbal reaction to "when you watch a football game

and you're yelling at the TV."  Id.  The relevant portion of

Hayes' deposition reads as follows:

> Q. And so you knew when you said [the Statement] that
> to the hearer, it would sound like a racist comment?
> A. No.  That was not part of my thinking at all.
> Q. Because you just weren't thinking about it at the
> time?
> A. I wasn't speaking with anyone in particular.  I was
> not having a conversation.  Ms. Bo[m]an was not even
> at her station.  She was behind me.  I was speaking
> actually, like, you know when you watch a football
> game and you're yelling at the TV, and I was not --
> Q. And that's what you were doing while you were at
> work on the morning of August 4?
> A. Is what I was doing --
> Q. Yelling at the TV?
> A. I wasn't yelling at the TV.  I made a -- a analogy
> like when you're watching a football game and you make
> comments to the TV set.

Hayes Dep. 117:22-118:16; see also id. at 153:24-154:14 (Hayes

affirming that he was "pretty much" talking to the TV because

the protester's remarks had upset him and he "needed to vent a little bit").[4]

Lt. Albanese reported the incident to the MBTA Police Department's deputy chief, Preston Horton, that same day, who quickly forwarded the report to Harry Marshall and Stephanie Brown, IXP's project and on-site managers, commenting: "FYI: action should be taken for this inappropriate comment."  Aff. Preston Horton ("Horton Aff."), Ex. D., Email from Preston Horton to Stephanie Brown & Harry Marshall (Aug. 4, 2018), ECF No. 41-4; MBTA's Facts ¶¶ 40-42.  Deputy Chief Horton also alerted Superintendent Richard Sullivan of the MBTA Police Department, who informed IXP management the following day that Hayes must "be removed from the schedule and not work at the MBTA police department" pending review of the incident.  MBTA SOF ¶ 42.  Boman also reported the incident to IXP management the next day.  Id. ¶ 43.  On August 6, 2018, Harry Marshall of IXP informed Deputy Chief Horton that, "after review of IXP employee statements and follow-up conversations with Dispatcher Hayes, we have deemed the incident and behavior under review to be inconsistent with IXP's Code of Conduct and established

---

[4] Hayes further stated that, had he been given the opportunity to do so, he would have apologized to Boman because he "know[s] the history of 'go back to Africa'" and "wanted to be crystal clear that that was not my intent."  Hayes Dep. 153:8-20.

policies and egregious enough to merit dismissal from IXP."  Id. ¶ 44; Horton Aff., Ex. F., Email from Harry Marshall to Preston Horton (Aug. 6, 2018), ECF No. 41-6.  Marshall also called Hayes on that same day to inform he was being fired.  IXP's Facts ¶¶ 45-47.

The parties dispute whether MBTA had the contractual authority to order IXP to fire Hayes.  Pl.'s Resp. Def. IXP's Facts ¶ 52, ECF No. 49.  IXP states that the firing was not MBTA's decision, but rather that it "decided to terminate Hayes based on its own policies and judgment."  IXP's Facts ¶ 44.  It explains that its investigation determined "that Hayes' comment and conduct was offensive and disruptive," "was likely to continue to disrupt IXP's operations," and that "that Hayes' comment and conduct was inconsistent with IXP's duties and culture."  Id. ¶¶ 37-44.

## II. ANALYSIS

The Court will first set forth the summary judgment standard of review and then take up a preliminary question, whether IXP (the private contractor that was Hayes' direct employer) can be sued under a state action theory.  After disposing of that question, the Court will turn to the meat of this case -- the free speech issues.

**A.    Standard of Review**

Summary judgment is appropriate when "there is no genuine issue as to any material fact, and . . . the moving party is entitled to judgment as a matter of law." Saunders v. Town of Hull, 874 F.3d 324, 326 (1st Cir. 2017) (citing Fed. R. Civ. P. 56(c)).  To avoid summary judgment, an issue of material fact "must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).  The moving party bears the initial burden of showing, at least, "that there is an absence of evidence to support the nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If this is done, the burden shifts to the nonmoving party to show that a trier of fact could reasonably find in her favor. Id.  The Court must examine the entire record in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor. Id.  An inquiring court is not obliged either 'to draw unreasonable inferences or credit bald assertions [or] empty conclusions.' Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018) (alteration in original) (quoting Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007)).

**B.    State Action**

IXP, a private contractor for the MBTA, was Hayes' direct employer and argues that therefore it cannot be sued under 42 U.S.C. § 1983, which reaches only state action.  IXP's Mem. 7-10.  The Supreme Court has explained that a private entity can qualify as a state actor under a few limited circumstances that include: "(i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity."  Manhattan Community Access Corp. v. Halleck, 139 S.Ct. 1921, 1929 (2019) (citations omitted).

Hayes asserts that all three of these categories are applicable to IXP, but the Court need only consider the second one, state compulsion.  "[A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  Blum v. Yaretsky, 457 U.S. 991, 1004 (1982).  IXP contends that there was no compulsion.  It relies on Mead v. Independence Ass'n, in which the First Circuit held that there was no compulsion even when a state agency "directed" a private corporation to replace an administrator of its assisted living centers.  684 F.3d 226, 230-32 (1st Cir. 2012).

11

Mead, however, is inapposite because the private company was not working for the state -- the agency issued its direction as a regulator and licensor, not as a boss.

Here, in contrast, IXP was under contract with the MBTA. The MBTA's Request for Proposal states that "[i]f the MBTA has issues with the performance of any of [IXP]'s employees, the MBTA can request, in writing, that the employee be . . . removed from their job by [IXP]."  Aff. Harry Marshall, Ex. D, Contract 47, ECF No. 46-4; id. ("[T]he MBTA can proceed directly to request dismissal of any of [IXP]'s employees"); see id. at 5 (MBTA Terms and Conditions providing that the Request for Proposal may be consulted to interpret the contract).  IXP was ordered to take action by both Deputy Chief Horton and by Superintendent Richard Sullivan of the MBTA Police Department, who wrote to IXP that Hayes must "be removed from the schedule and not work at the MBTA police department" pending his review of the incident.  MBTA's Facts ¶ 40-42.  That was a demand for suspension pending review, not outright termination, but it certainly implied that, if the initial report turned out to be factually correct after review, Hayes ought be fired.  It seems almost beyond doubt that the MBTA "provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."  Blum, 457 U.S. at 1004.

Moreover, unlike in <u>Mead</u> where the state agency directed that the plaintiff be removed from just one of the plaintiff's fifteen administrative roles, 684 F.3d at 232, Hayes' sole duties at IXP were tied to the MBTA contract.  Removing Hayes from the MBTA contract meant, as a practical matter, letting him go.  This case is more analgous to <u>Vazquez</u> v. <u>Lopez-Rosario</u>, in which the First Circuit found state action when the plaintiff's "dismissal came at the insistence of the Board of Governors of a state agency, an agency which had retained the power in its contract to demand the dismissal of 'key personnel.'"  134 F.3d 28, 33 n.2 (1st Cir. 1998).  Accordingly, the Court rules that IXP was a state actor with respect to its firing of Hayes.

### C.   First Amendment Claim -- <u>Pickering</u> Test

The First Circuit wields a three-part test to decide "whether an adverse employment action against a public employee violates her First Amendment free speech rights." <u>Decotiis</u> v. <u>Whittemore</u>, 635 F.3d 22, 29 (1st Cir. 2011) (footnote omitted). "First, a court must determine 'whether the employee spoke as a citizen on a matter of public concern.'" <u>Id.</u> (quoting <u>Curran</u> v. <u>Cousins</u>, 509 F.3d 36, 45 (1st Cir. 2007); <u>Garcetti</u> v. <u>Ceballos</u>, 547 U.S. 410, 418 (2006)).  "Second, the court must 'balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services

it performs through its employees.'"  Id. (omission in original)
(quoting Curran, 509 F.3d at 44; Pickering v. Board of Educ.,
391 U.S. 563, 568 (1968)).  "Third, the employee must 'show that
the protected expression was a substantial or motivating factor
in the adverse employment decision.'"  Id. (quoting Curran, 509
F.3d at 45).

Here, only the second prong -- the Pickering balancing test
-- is genuinely in dispute, since the defendants do not
challenge that Hayes was speaking as a citizen on a matter of
public concern or that the Statement was a motivating factor in
his termination.[5]  Rather, the controversy is whether Hayes' free
speech interests are outweighed by the MBTA's efficiency
interests.  "In assessing the government's interest in allaying
disruption and inefficiencies in the workplace, a court should
include in its considerations (1) 'the time, place, and manner
of the employee's speech,' and (2) 'the employer's motivation in
making the adverse employment decision.'"  Decotiis, 635 F.3d at
35 (quoting Davignon v. Hodgson, 524 F.3d 91, 104 (1st Cir.
2008)).  "[T]he Pickering balancing test requires a hard look at
the facts of the case, including the nature of the employment
and the context in which the employee spoke."  Id.

---

[5] The MBTA notes that, although it does not concede that
Hayes was its employee, it assumes for purposes of this motion
that he was.  MBTA's Mem. 5 n.3.

The Court concludes that factual disputes preclude summary judgment in this case.  Beginning with Hayes' interest, the record is somewhat unclear as to the audience for his inflammatory comment.  By his own account, he was essentially talking to himself -- or, perhaps, to the television, like a fan groaning when his football team fumbles the ball.  In his deposition, Hayes explained that he "wasn't speaking with anyone in particular" and "was not having a conversation" but was simply "vent[ing]."  Hayes Dep. 118:4-5, 154:12.  If that is taken as the whole story, then his interest in such random commentary is miniscule.  Yet that may be reading too much into his description.  Hayes argues that he was in essence "complaining to everyone in the room" about the news segment and his remark was "a form of communication without directly speaking to anyone in particular -- much like someone on a soap box."  Pl.'s Resp. Def. IXP's Facts ¶ 9.  A reasonable factfinder could agree with Hayes and find some free speech interest, similar to the "private conversation with another employee" in Rankin v. McPherson, 483 U.S. 378, 389 (1987).

In Rankin, the Supreme Court ruled that the First Amendment protected an employee's comments (after a news bulletin) wishing that President Reagan's would-be assassin had succeeded.  Id. at 392.  Hayes relies on that case to the point of calling this one "Rankin Part II," Opp'n 11, yet there are grounds to distinguish

15

the two.  This leads to the other side of the scale: the
governmental interest in suppressing speech of this sort.
Rankin was a peculiar case in which it was "undisputed" that the
plaintiff was fired "based on the content of her speech"; "there
[was] no evidence that it interfered with the efficient
functioning of the office"; and the employer "was evidently not
afraid that [the plaintiff] had disturbed or interrupted other
employees."  Id. at 389-90 (emphasis in original).  Rankin
affirmed that governmental employers have a strong interest in
suppressing a "statement [that] impairs discipline by superiors
or harmony among co-workers, has a detrimental impact on close
working relationships for which personal loyalty and confidence
are necessary, or impedes the performance of the speaker's
duties or interferes with the regular operation of the
enterprise."  Id. at 388 (citing Pickering, 391 U.S., at 570-
73).

Here, unlike in Rankin, there is ample evidence in the
record that Hayes' comment disturbed other employees and could
have disrupted the efficiency and harmony of the workplace.  See
Waters v. Churchill, 511 U.S. 661, 681 (1994) (explaining that
the "potential disruptiveness" of a nurse's comments to another
nurse discouraging her from transferring to the obstetrics
department "was enough to outweigh whatever First Amendment
value the speech might have had").  Hayes' remark caused a small

commotion in the office and certainly could have impaired the smooth workings of the communications center going forward.  If Hayes were fired on that basis, the employers' interest in efficiency would more than counterbalance his own in making such comments in the workplace.

Yet the motivations of the MBTA and IXP in firing Hayes are genuinely disputed here.  IXP claims that it "decided to terminate Hayes based on its own policies and judgment," determining "that Hayes' comment and conduct was offensive and disruptive," "was likely to continue to disrupt IXP's operations," and "that Hayes' comment and conduct was inconsistent with IXP's duties and culture."  IXP's Facts ¶¶ 37-44.  Hayes argues that "there is a genuine issue of material fact [whether] IXP terminated [him] because of the content of his speech rather than any perceived disturbance to their operations, which is a question for the jury."  Opp'n 15.  The Court agrees with Hayes that a reasonable jury could find that Hayes was fired because of the content of his speech, and therefore summary judgment is inappropriate.

IXP seemingly offers two general reasons for the firing: "IXP determined that Hayes' comment and conduct was offensive and disruptive."  IXP's Facts ¶ 39.  If IXP and the MBTA acted to prevent workplace disruption, then Hayes' free speech rights were not violated.  If, however, the employers' motivation was

simple disagreement with the content of his speech -- that his comment was "offensive" -- then Hayes' speech was protected by the First Amendment, as was the employee's offensive comment in Rankin expressing desire that President Reagan be assassinated. As the Supreme Court explained, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."  Rankin, 483 U.S. at 384.

Precedent from the First Circuit's Mihos decision illustrates the point.  There, the Acting Governor of Massachusetts fired two members of the Massachusetts Turnpike Authority because of their votes postponing a toll increase. 358 F.3d at 96-97.  The First Circuit held that the fired employees stated a claim for violation of their First Amendment right to free speech (in the form of votes), explaining:

> [I]f Swift fired Mihos because she was concerned that the tangible results of his vote would negatively affect the efficient functioning of government services and the financial standing of the Turnpike Authority, she would have weighty interests on her side of the Pickering scale.  On the other hand, if Swift fired Mihos in a retaliatory fit of pique because she disagreed with his vote and wished to punish him, she would have no legitimate governmental interests on her side of the scale.  Indeed, Swift's true motivation for firing Mihos for his vote is a core issue in this case.

Id. at 103 (footnote omitted) (emphasis supplied).[6]

Here, there is enough evidence in the record to permit a reasonable jury to find that the employers' "true motivation" for firing Hayes was their disagreement with the content of his speech, rather than the potential workplace disruption it would cause.  For instance, Harry Marshall, IXP's project manager who fired Hayes, stated that he did not call any other employees in the room before terminating Hayes.  Aff. Lucas Newbill, Ex. 2, Dep. Harry Marshall 38:5, ECF No. 55-2.  Moreover, Boman had emailed a manager at IXP stating that "I was bothered at the moment the comment was made, but I am okay now."  Aff. Harry Marshall, Ex. G, Email from Latoya Boman to Stephanie Brown (Aug. 6, 2018) 2, ECF No. 46-7.  Hayes also claims that he "was never given the opportunity" to apologize to Boman and would have done so.  Hayes Dep. 153:4.  Those facts, if believed by the jury and interpreted in a light favorable to Hayes, might give rise to an inference that IXP was not genuinely interested in the actual or potential effects of Hayes' behavior on the

---

[6] It is true that the First Circuit has since observed that Mihos has been undermined by the Supreme Court's holding that "the First Amendment shields from discipline the expressions employees make pursuant to their professional duties."  Eves v. LePage, 842 F.3d 133, 143 (1st Cir. 2016) (quoting Garcetti, 547 U.S. at 426).  Yet that affects only the votes-as-speech aspect of Mihos' reasoning.  The holding that a First Amendment retaliation claim turns on the employer's true motivation remains good law.

workplace dynamics, but rather objected to the content of the comment itself.  In addition, a jury could draw such an inference from the direct involvement of the Superintendent and Deputy Chief of the MBTA Police Department.  The record does not disclose whether these senior officials would typically be involved in disciplinary action for disruptive behavior of IXP employees.  To the extent that such involvement was atypical, a jury might conclude that their intervention against Hayes was spurred by the content of his speech rather than its effect on the workplace.[7]

In short, the defendants' true motivations in firing Hayes are subject to genuine dispute.  Was there an impermissible retaliatory motive related to the content of the speech and, if so, was it a but-for cause of Hayes' firing?  These are

---

[7] Hayes next argues that Supreme Court precedent required IXP to "conduct[] a reasonable investigation and ma[k]e a correspondingly reasonable determination that Plaintiff's continued employment would have imperiled their operations." Opp'n 16 (citing Waters, 511 U.S. at 677-78).  Yet Waters forbids "[o]nly procedures outside the range of what a reasonable manager would use."  511 U.S. at 678.  The undisputed facts show that Marshall received statements from two employees present during Hayes' Statement (though he did not call them) and called Hayes, who did not deny making the Statement.  IXP's Facts ¶¶ 31, 34.  That cannot be deemed unreasonable.  In any case, the Supreme Court emphasized that Waters concerned the procedural duties of an employer in assessing a hearsay report of a conversation that was disputed.  511 U.S. at 677-78.  Nothing significant about the Statement is disputed, so nothing turns on the precise procedures IXP used in determining the facts of the incident.

questions for the jury.  See Nieves v. Bartlett, 139 S.Ct. 1715,
1732 (2019) (citing Hartman v. Moore, 547 U.S. 250, 256, 260
(2006)).  Accordingly, the Court DENIES the motions for summary
judgment as to count I, the First Amendment claim.

### D.   State Law Free Speech Claims

In count II, Hayes alleges that his termination violated
the Massachusetts Civil Rights Act (the "MCRA").  Am. Compl. ¶
247.  The MCRA is the "state-law analogue to 42 U.S.C. § 1983
that provides a statutory civil cause of action against those
who 'interfere' with the exercise or enjoyment of rights secured
by federal or state law."  Nolan v. CN8, 656 F.3d 71, 76 (1st
Cir. 2011) (citing Mass. Gen. Laws ch. 12, § 11H).  "To
establish a claim under the MCRA the plaintiff must prove that
'(1) [his] exercise or enjoyment of rights secured by the
Constitution or laws of either the United States or of the
Commonwealth, (2) [has] been interfered with, or attempted to be
interfered with,' by a person within the meaning of the act, and
'(3) that the interference or attempted interference was by
threats, intimidation or coercion.'"  Williams v. O'Brien, 78
Mass. App. Ct. 169, 173 (2010) (alterations in original)
(quoting Swanset Development Corp. v. City of Taunton, 423 Mass.
390, 395 (1996)).

Here, it is undisputed that Hayes was an at-will employee.
IXP's Facts ¶ 3.  Nor is it genuinely disputed that Hayes was

never threatened, intimated, or coerced by IXP in any way other than his termination.  Id. ¶¶ 49-51.  Those facts are fatal to Hayes' MCRA claim, because terminating an at-will employee is not actionable under the MCRA.  Nolan, 656 F.3d at 77-79 (citing Webster v. Motorola, Inc., 418 Mass. 425, 430 (1994)). Accordingly, the Court GRANTS IXP's motion for summary judgment as to count II.

**E.   Wrongful Termination -- Count XII**

Count XII alleges that Hayes' termination as a result of the Statement was wrongful under Massachusetts law because his speech was protected by the First Amendment.  Am Compl. ¶ 272. "As an exception to the general rule that an employer may terminate an at-will employee at any time with or without cause, [Massachusetts courts] have recognized that an at-will employee has a cause of action for wrongful termination only if the termination violates a clearly established public policy."  King v. Driscoll, 418 Mass. 576, 582 (Mass. 1994) (citations omitted).  The public policy exception has been interpreted narrowly, since to do otherwise would "convert the general rule . . . into a rule that requires just cause to terminate an at-will employee."  Id. (citations omitted); accord Surprise v. Innovation Group, Inc., 925 F. Supp. 2d 134, 148 (D. Mass. 2013) (Saylor, J.) (noting that wrongful termination claims are "a

narrow exception to the general rule of at-will employment in Massachusetts").

"The public policy exception makes redress available to employees who are terminated for asserting a legal right (e.g., filing a workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to disobey the law (e.g., refusing to commit perjury)." Upton v. JWP Businessland, 425 Mass. 756, 757 (1997). "It is for the judge, not the jury, to 'determine whether, on the evidence, there is a basis for finding that a well-defined, important public policy has been violated.'" Flynn v. City of Boston, 59 Mass. App. Ct. 490, 493 (2003) (quoting Mello v. Stop & Shop Cos., 402 Mass. 555, 561 n.7 (1988)). If the Court so determines, then it puts to the jury the question of whether the employee was in fact fired on the basis of that protected conduct. Id. at 493-94.

The Court rules that asserting one's right to free speech under the First Amendment is a well-defined, important public policy for purposes of Massachusetts' wrongful termination cause of action. Cf. Minahan v. Town of East Longmeadow, No. 12-cv-30203-MAP, 2014 WL 7883586, at *20 (D. Mass. Sept. 11, 2014) (Hennessy, M.J.), adopted in relevant part, 2015 WL 668451, at *1 (D. Mass. Feb. 17, 2015) (Ponsor, J.). As explained above, it is a question for the jury whether Hayes' termination in fact

violated his First Amendment rights.  The Court therefore DENIES
IXP's motion for summary judgment as to count XII.

## III. CONCLUSION

For the reasons stated above, the Court DENIES the motions
for summary judgment as to counts I and XII, but GRANTS IXP's
motion for summary judgment as to count II.


**SO ORDERED.**

/s/_____
WILLIAM G. YOUNG
U.S. DISTRICT JUDGE